## VINTON GRAIN CO., Inc., v. RICKERSON et al.

### No. 1129.

Court of Appeal of Louisiana. First Circuit.

May 22, 1933.

Cline, Plauche & Thompson, of Lake Charles, for appellant.

Spearing & McClendon, of New Orleans, for appellees.

LE BLANC, Judge.

On July 31, 1930, the Louisiana highway commission awarded a contract to Lawrence Construction Company of Jackson, Miss., under which the latter bound and obligated itself to build a certain paved highway extending 4.86 miles west from the town of Vinton in the parish of Calcasieu, known and described in the contract as state project 1900. Lawrence Construction Company sublet part of the work it was obligated to do under the contract to George W. Rickerson, one of the defendants in this suit. The Union Indemnity Company became bondsman for the Lawrence Construction Company, guaranteeing full and faithful compliance with all the terms and conditions of the contract. The claim here presented is one for feed furnished by the plaintiff, Vinton Grain Company, Inc., to Rickerson for the mules and

other live stock used by him in the construction and erection of the road, and, he having failed to pay for same, demand is now made on the Union Indemnity Company on its bond. The amount is said to be a balance of $1,294.38, and, as more than thirty days had elapsed since amicable demand for payment, there is a demand for 10 per cent. additional for attorney's fees.

Rickerson made no defense, and judgment went against him by default. He is not a party to this appeal, which was taken by plaintiff from the judgment below, which rejected the demand as against Union Indemnity Company.

From the testimony, it appears that, when Rickerson started on the job, he established a line of credit with the plaintiff company for groceries as well as for the feed account which is here sued on. The bills for groceries were not separated from those for the feed, and they were all carried on the same account. The account, about the middle of January, 1931, amounted to $4,998.33. It is not disputed that the bondsman under the Public Works Building Law, Act No. 224 of 1918 as amended by Act No. 271 of 1926, whilst liable for feed that is used and consumed by mules and other live stock used on the work, is not liable for groceries furnished to the contractor. Nor, we understand, is it disputed that he is liable for feed furnished the subcontractor to the same extent as he would be for that advanced to the contractor.

Toward the latter part of 1930, or during the early days of 1931, Rickerson defaulted on his contract, and, on notice to that effect by Lawrence Construction Company, United States Fidelity & Guaranty Company, surety on his bond, assumed his subcontract and placed him in charge of the work. At that time Lawrence Construction Company owed Rickerson a sum in excess of $5,000. The testimony indicates plainly that Mr. Roy Miller, manager of the plaintiff company, was fully aware of the fact that Rickerson had defaulted on his contract and that his surety had taken over the work. He knew also that Lawrence Construction Company was indebted unto Rickerson and was anxious to see him paid so that his company in turn could be paid their indebtedness. So anxious, in fact, was he, that Rickerson says that he interceded for him, rang up the bonding company in New Orleans, and finally "scared" Lawrence into mailing the check to the bonding company. This check, which was given by the Lawrence Construction Company to the United States Fidelity & Guaranty Company, on January 8, 1931, was for the sum of $5,697.34. From that amount, $1,000 was deducted to meet a payroll, $8.55 was paid for exchange, and the balance, $4,688.79 was deposited in the Calcasieu National Bank at Lake Charles, subject to withdrawal by check signed by Rickerson, and countersigned by

Terrell Woosley, local agent of the United States Fidelity & Guaranty Company. On this amount so deposited there was drawn on January 16, 1931, a check signed by Rickerson and countersigned by Woosley, in the sum of $2,000, payable to the order of Vinton Grain Company, which check was delivered to Mr. Miller by Rickerson in person. In using that check in liquidation of his company's account, Miller, who had in the meantime segregated the feed bills from the grocery account, applied the whole amount to the grocery account, extinguishing that account in full, and gave credit on the feed account for the balance. That balance not being sufficient to pay the feed bill in full, plaintiff now seeks to hold the Union Indemnity Company for the remainder, which is the amount herein sued upon.

The defense of the Union Indemnity Company, of course, is that the payment should have been applied to the feed account, and, as the balance of that account has since been paid in full, plaintiff can recover nothing further from it, as it is not liable for the grocery account.

The issue involved, therefore, is with regard to the imputation of payment of the $2,000, the proceeds of the check received by plaintiff from Rickerson.

The contention made in behalf of the plaintiff is that it was Rickerson who was its debtor, that he was the one concerned in the discharge of the debt, and that, as he consented to the imputation of the payment to the grocery account, it was properly applied, and they are entitled to recover the balance on the feed bill from the contractor's bondsman.

This contention necessarily brings us to a consideration of the circumstances under which the check was given and the payment made.

The evidence satisfies us that Miller knew all that was going on and that he had been advised by his own attorney, and by representatives of both the Union Indemnity Company and the United States Fidelity & Guaranty Company, that, whilst the latter was liable for his company's feed bills, it was not liable for the grocery account. It was upon securing this information that he separated the two accounts. He is not certain when Rickerson presented the check to him; believes that it was on or about January 19, 1931, which was some days after he had divided the account. He says that, when Rickerson delivered it, there was a discussion between them as to the application of the funds and that Rickerson practically consented to the payment of the grocery account when he told him that he "could do as he pleased."

Rickerson's testimony, however, which is far more positive, is that on the same day that the check was drawn, January 16, 1931, he drove from Lake Charles to Vinton with

it, and delivered it to Miller that same day. He went to Mr. Woosley's office to have the latter countersign the check as required, and, fearful that it might be lost on the way, he himself did not sign it until he reached Vinton. He says that on that day there was no conversation with regard to the application of the proceeds, but that it was a day or two after that Miller called him at the hotel where he stopped in Vinton and asked him to come over to his office. He complied with the request, and it was then for the first time that Miller asked him about imputing the payment to the grocery account. He says that Miller told him he had found out that the Union Indemnity Company was not liable for the groceries, and asked him, "What about crediting the full amount of groceries on this check, giving the feedbill credit for the balance of it?" He says that Miller even asked him to write such an indorsement on the check itself. This he refused to do, for the reason that the check had been countersigned by Woosley, and he did not think he had the authority to write anything on it out of his presence. The inference to be drawn from his testimony is that he doubted his authority throughout to consent to the application, the most that he was willing to do, and did, being to tell Miller that he had the check in his possession, to do as he pleased about it.

We believe that Rickerson's testimony reflects the true facts as to what occurred. He was the one making the payment, and had good reason to be impressed with the way in which the check was handled. Besides, he is far more positive in his statements than is Miller.

■ Article 2163, R. C. C., gives to the debtor of several debts the right to declare, "when he makes a payment, what debt he means to discharge." Conceding, for the sake of argument, that Rickerson was the debtor and enjoyed that right, although this may be said to be doubtful from the fact that the check had to be countersigned by Woosley, agent of the United States Fidelity & Guaranty Company, he did not exercise it at the time the check was delivered. Counsel for plaintiff urge, however, that the payment was not as of the day on which the check was delivered, but when it was collected or when the account was credited, and that, accepting Rickerson's testimony that it was not until a day or two after the delivery of the check that he consented to the application of the funds, that was the day on which the account was credited and the imputation as made was legal and valid. We do not agree with this contention. When the check was delivered to Miller on January 16, 1931, it was accepted by him without any condition attached to it as to how the proceeds should be applied. Its acceptance by Miller operated as a payment then and there, and, as

Rickerson did not, "when he made the payment," declare which of the two debts he meant to discharge, plaintiff cannot claim the benefits of the article of the Civil Code which it invokes, under the consent. Miller claims to have obtained from him.

■ But it is our opinion that Rickerson, strictly speaking, was not the debtor to exercise the right given under the article of the Code referred to. At least he was no longer the sole debtor, as, after his default on his contract, his surety, United States Fidelity & Guaranty Company, which took it over, assumed all his legal obligations thereunder, and had a vital interest in seeing how they were going to be discharged. That company became a joint debtor with Rickerson, and had an equal right with him in using the funds paid over by Lawrence Construction Company on his contract to discharge those obligations which the law made them responsible for as his surety. It is manifest that it wanted to protect itself in its rights from the fact that these funds were not to be withdrawn from the bank, unless the check therefor was countersigned by their local agent.

As we have already pointed out, Mr. Miller was familiar with the entire situation through long-distance telephone conversations with the bonding companies, through the advice of his attorneys, and through direct information imparted to him by representatives of both the Union Indemnity Company and the United States Fidelity & Guaranty Company. It had been made plain to him that the bonding company recognized their liability for the feed bills contracted by Rickerson, but not for the grocery account. He also knew of Rickerson's default and that his contract had been taken over by the surety on his bond. He knew where the money with which he was paid came from, and in fact had been instrumental in seeing it paid by Lawrence Construction Company. With all this knowledge in his possession, it looks apparent that his segregation of the two accounts a few days before he received the check, and his then holding the check for a day or two in order to obtain Rickerson's consent to apply the proceeds to the grocery account, was a premeditated and deliberate attempt on his part to liquidate his unsecured account with those funds and leave only the feed account, which he knew the bonding company was liable for, open on the books.

■■ Assuming again, however, that Rickerson was the debtor, and considering the conversation he had with Miller relative to the imputation of the proceeds of the check in the light most favorable to the plaintiff, we are unable to construe it as the declaration required under article 2163, R. C. C., that he meant to discharge the grocery account first. Counsel for plaintiff cite Hortman-Salmen Company v. Continental Casualty Company, 170 La. 879, 129 So. 515, to the effect that

under some circumstances the imputation of payment made by the materialman cannot be disturbed, even though it operated to the prejudice of the surety. The circumstance referred to in that particular case, which counsel themselves point out in their brief, arose from the lack of knowledge on the part of the creditor as to the source of origin of the fund out of which the debtor made the payment. As we have held the facts to be exactly otherwise in this case, clearly the authority does not apply. There having been no declaration as to which of the debts was to be discharged, and no receipt accepted by Rickerson showing how the payment was to be applied, the law itself under article 2166, R. C. C., imputed it to the debt which he had the most interest in discharging. This the Supreme Court has construed to mean a debt for which a surety is bound with him rather than one for which he is singly bound. J. O. Miller & Co. v. The S. F. J. Trabue, 16 La. Ann. 375.

We are of the opinion that the judgment of the lower court has correctly disposed of the issue presented, and it is accordingly affirmed.